**Robert F. GIFFORD, Plaintiff, Appellant,**

v.

**AMERICAN CANADIAN CARIBBEAN LINE, INC., Defendant, Appellee.**

No. 00–1688.

United States Court of Appeals, First Circuit.

Heard Oct. 4, 2001.

Decided Jan. 10, 2002.

111 S.Ct. 453.

David F. Anderson, with whom David J. Berg and Latti & Anderson LLP were on brief, for appellant.

Brian B. Kydd, with whom Kneeland & Kydd were on brief, for appellee.

Before LYNCH, Circuit Judge, STAHL, Senior Circuit Judge, and LIPEZ, Circuit Judge.

LIPEZ, Circuit Judge.

Robert F. Gifford, the captain of a cruise ship, was injured when he fell out of a small rescue boat used by the ship and was struck on the leg by the boat's outboard motor. Claiming that the district court gave the jury an erroneous instruction on causation, he appeals a jury verdict finding the operator, American Canadian Caribbean Line, Inc. ("ACCL"), not liable for his injuries. Because the jury instructions, taken as a whole, correctly stated the law, we affirm.

## I.

Gifford was captain of the M/V NIAGRA PRINCE, a 180–foot passenger cruise ship chartered and operated by ACCL. On board the NIAGRA PRINCE was a smaller boat, "the Zodiac," a hard-bottomed inflatable vessel with a 40 horsepower outboard motor. On January 11, 1997, when the ship was anchored in the Gorda Sound in the British Virgin Islands, two passengers requested that Gifford ferry them to shore. The Zodiac was lowered into the water for that purpose.

Gifford had encountered intermittent problems in attempting to start the Zodiac since the summer of 1996, and on January 11, 1997, the engine again failed to engage. Gifford replaced the battery, examined the spark plugs, and checked the fuel system, but found nothing out of the ordinary. He eventually succeeded in starting the Zodiac using a pull cord attached to the motor.

The parties dispute what happened next. Gifford testified that the engine was sputtering, and in an attempt to clear out what he believed was a blockage in the fuel line,

he got the Zodiac moving at a speed of about 10 miles per hour. As he reached to open a drain plug on the back wall of the boat to allow some water with a little fuel to drain out, the engine slowed abruptly and hesitated, causing the bow to pitch downward. Gifford testified that the engine then picked up again, causing him to lose control of the tiller. At this point the Zodiac turned and tilted to the right, and Gifford fell out of the boat.

ACCL challenged this account, based on eyewitness testimony that the Zodiac was running smoothly in the moments just before the accident, and did not hesitate or surge. ACCL pointed to evidence tending to show that Gifford fell out of the boat because he had grease and oil on his hands. It also noted that Gifford had failed to attach a safety lanyard that would have turned off the engine when he fell out of the boat.

With Gifford now in the water, the Zodiac continued to turn to the right, circling back around him. On its second pass the Zodiac was heading directly at Gifford, who dove under the water in an effort to avoid being hit. His left leg got caught in the propeller and he was seriously injured.

Gifford's complaint, in relevant part, alleged negligence on the part of ACCL under the Jones Act, 46 U.S.C.App. § 688,[1] and unseaworthiness under general maritime law. A plaintiff need not prove negligence to recover on a theory of unseaworthiness, which is based instead on "the shipowner's absolute duty to provide to every member of his crew a vessel and appurtenances reasonably fit for their intended use." *Ferrara v. A. & V. Fishing, Inc.*, 99 F.3d 449, 453 (1st Cir.1996) (cita-

---

1. The statute reads, in relevant part:
   "Any seaman who shall suffer personal injury in the course of his employment may, at his election, maintain an action for damages at law, with the right of trial by jury, and in such action all statutes of the United States modifying or extending the common-law right or remedy in cases of personal injury to railway employees shall apply...." 46 U.S.C.App. § 688.

tion and internal quotation marks omitted). After a three day trial in March of 2000, the jury rejected Gifford's claims. The district court denied his motion for a new trial, and Gifford now appeals.

## II.

■ Gifford argues that the district court gave the jury an incorrect instruction on causation with respect to his unseaworthiness claim. To prevail on a theory of unseaworthiness, Gifford had to prove that the unseaworthy condition was a direct and substantial cause of his injury. *Brophy v. Lavigne,* 801 F.2d 521, 524 (1st Cir.1986); *see also Perkins v. American Elec. Power Fuel Supply, Inc.,* 246 F.3d 593, 602 (6th Cir.2001) ("To prove an unseaworthiness claim, a plaintiff must show that the unseaworthy condition of the vessel was the substantial and direct or proximate cause of the plaintiff's injuries."); *Hernandez v. Trawler Miss Vertie Mae, Inc.,* 187 F.3d 432, 439 (4th Cir.1999) ("the proximate or direct and substantial cause") (citation and internal quotation marks omitted); *Alverez v. J. Ray McDermott & Co.,* 674 F.2d 1037, 1043 (5th Cir.1982) ("a direct and substantial cause").[2]

In its initial charge to the jury, the district court explained the causation requirement for an unseaworthiness claim as follows:

[The plaintiff] has to show that the ship's unseaworthiness was a substantial direct cause of his injuries.... You need ... to decide how the accident happened, what happened, how was the plaintiff injured, and then determine whether the unsafe condition of the ves-

sel was a substantial contributing cause to the injuries that the plaintiff suffered.

During their deliberations, the jurors returned with a question:

At what point are we determining the seaworthiness of the Zodiac? I.e., is it at the point of the accident or from the time the Zodiac was dropped into the water?

After consulting with the attorneys, the judge offered the following response, which Gifford does not challenge:

It's not exactly either. I suggest to you, after having talked with the lawyers, that it is at any time surrounding the accident and leading up to the plaintiff's being hurt.

The following colloquy ensued:

A JUROR: At any time ...

THE COURT: At any time surrounding the accident and leading up to the plaintiff's being hurt.

A JUROR: Surrounding the accident ...

THE COURT: It's at any time—well ...

A JUROR: That's why we need, when it was dropped in the water or when the boat was moving and he fell out of the boat.

THE COURT: When he fell out of the boat is probably the time that you really need to focus on.

[PLAINTIFF'S COUNSEL]: Whether it is seaworthy.

THE COURT: Right.

A JUROR: Did I hear you say, "it can be" or "it will be"? I'm not sure I heard the right word.

---

**2.** In contrast to unseaworthiness, a negligence claim under the Jones Act requires a lesser degree of causation:

A plaintiff's burden of proving causation under the Jones Act is featherweight....

Liability, therefore, exists if the employer's negligence contributed even in the slightest to the plaintiff's injury.

*Ferrara,* 99 F.3d at 453 (citations and internal quotation marks omitted).

THE COURT: I said, "At any time surrounding the accident and leading up to plaintiff's being hurt." And in response to Mr. Eaton's [the juror's] question about when he was being hurt. I mean, that's time you really need to focus on it.

At this point Gifford objected.[3]

Gifford contends that the judge's final comment—that the jury should focus on the time "when he was being hurt"—was an incorrect statement of the law because it gave the jury the erroneous impression that it had to find the Zodiac unseaworthy *at the precise moment of Gifford's injury* (when the propeller hit his leg) to hold ACCL liable. He points out that although the Zodiac was unseaworthy when it allegedly hesitated and surged forward, tossing him overboard, the engine was running smoothly at the precise moment the propeller hit his leg, and the jury could therefore have found that the Zodiac was seaworthy.

■■■ "Our review of jury instructions is de novo to ascertain whether the challenged instruction has 'a tendency to confuse or mislead the jury with respect to the applicable principles of law.'" *Romano v. U–Haul Int'l*, 233 F.3d 655, 665 (1st Cir.2000) (quoting *Tatro v. Kervin*, 41 F.3d 9, 14 (1st Cir.1994)). However, "it is axiomatic that 'a single instruction to a jury may not be judged in artificial isolation, but must be viewed in the context of the overall charge.'" *United States v. Femia*, 57 F.3d 43, 47 (1st Cir.1995) (quoting *Cupp v. Naughten*, 414 U.S. 141, 146–47, 94 S.Ct. 396, 38 L.Ed.2d 368 (1973)).

■■■ We agree with Gifford that it would have been an error of law for the district court to require that the Zodiac be unseaworthy at the precise moment of his injury, rather than at the time he fell out of the boat. Unseaworthiness at the time Gifford fell out of the Zodiac could obviously have been a direct and substantial cause of his subsequent injury. We conclude, however, that the district court's instructions, taken as a whole, did not suggest that the jury should focus on the precise moment of Gifford's injury.

In her initial charge to the jury, the judge explained that Gifford had to show that the boat's unseaworthiness was "a substantial direct cause of his injuries." In response to the jury's question—"At what point are we determining the seaworthiness of the Zodiac?"—the judge explained *three times* that the jury should focus on the condition of the Zodiac "at any time surrounding the accident and leading up to the plaintiff's being hurt." She also suggested, consistent with that instruction, that the jury focus on the time "when he fell out of the boat." In the specific context of this case, these explanations are consistent with the general requirement that the Zodiac's unseaworthiness be a direct and substantial cause of Gifford's injury. Based on the evidence at trial, Gifford would not have been injured if he had not fallen out of the boat. The critical question on the unseaworthiness claim was whether the unseaworthiness of the Zodiac was a direct and substantial cause of that fall. The district court was therefore correct to direct the jury's attention to the "time surrounding the accident and leading up to the plaintiff's being hurt," or "when he fell out of the boat." The parties agree with this focus.

Only after these explanations did the court say that the jury should focus on "when he was being hurt." In this context, the jury would have understood the phrase "when he was being hurt" to be simply another reference to the "time sur-

---

**3.** The judge interrupted Gifford's attorney before he could explain the precise nature of the objection. This interruption has no bearing on the outcome of this appeal.

rounding the accident" or "when he fell out of the boat." While a more precise formulation would have been preferable, we are unpersuaded that this one remark, taken in the context of the instructions as a whole, had a tendency to confuse or mislead the jury. *Romano*, 233 F.3d at 665.

The alternatives the jury set out in its question to the judge buttress our conclusion that the jury was not misled by the judge's final comment. The jury asked if unseaworthiness should be determined "from the time the Zodiac was dropped into the water" (at which time the engine was indisputably not working), or "at the point of the accident," defined by one juror during the colloquy with the judge as "when the boat was moving and he fell out of the boat" (at which time the engine's condition was disputed). In other words, the jury appears to have been uncertain what to do if—as some of the evidence suggested—the Zodiac was unseaworthy when it was dropped into the water, but seaworthy when Gifford fell out of it. The jury's question does not evidence any concern about the distinction between the point at which Gifford fell out of the boat and the point at which the propeller hit Gifford's leg, a distinction upon which Gifford claims the verdict turned.

Nor do we believe that the judge's final words precipitated a sudden shift in the jury's focus. Gifford argues that the jury must have taken her final comment to mean it should focus on the precise moment of his injury, because "the members of this jury had proven themselves to be unafraid of questioning the Court, asking five follow up questions during the brief time in which they had returned to the courtroom for the response to their original written question." Gifford reasons that "there can be no doubt that they would have asked more questions if they felt that they did not understand what the District Court was saying." We believe that the opposite inference is more compelling: if the jury thought that the judge's final comment required it to disregard the instruction she had just repeated three times, it would have requested clarification. We deem it most improbable that the jury would have engaged in a fundamental reorientation of its deliberations, with no further questions, based on the judge's ambiguous final remark. Therefore, the absence of such questions supports our determination that the jurors interpreted the judge's final comment as a reiteration of her previous explanation. They would have understood "when he was being hurt" as a shorthand for the "time surrounding the accident and leading up to the plaintiff's being hurt." Reading the instructions in their entirety and in the context of the question the jury posed, as we must, we conclude that the instructions did not have a tendency to confuse or mislead the jury. *Romano*, 233 F.3d at 665.

**Affirmed.**